# STATE OF MICHIGAN

# COURT OF APPEALS

JODE INVESTMENTS, LLC, CLUB GOLF
PROPERTIES, LLC, CLUB GOLF INVESTORS,
LLC,

        Plaintiffs/Counter Defendants-
        Appellants/Cross-Appellees,

v

BURNING TREE PROPERTIES, LLC,
BURNING TREE INVESTORS, LLC, SIMONE
MAURO, SALVATORE DIMERCURIO,
SERGIO GESUALE,

        Defendants/Counter
        Plaintiffs/Third-Party Plaintiffs-
        Appellees/Cross-Appellants,

v

ANTHONY MARROCCO and ANTHONY
FANELLI,

        Third-Party Defendants-
        Appellants/Cross-Appellees.

UNPUBLISHED
February 27, 2018

No. 335299
Macomb Circuit Court
LC No. 2011-000291-CZ

JODE INVESTMENTS, LLC, CLUB GOLF
PROPERTIES, LLC, CLUB GOLF INVESTORS,
LLC,

        Plaintiffs/Counter Defendants-
        Appellees,

v

BURNING TREE PROPERTIES, LLC,
BURNING TREE INVESTORS, LLC, SIMONE
MAURO, SALVATORE DIMERCURIO,
SERGIO GESUALE,

No. 336726
Macomb Circuit Court
LC No. 2011-000291-CZ

Defendants/Counter
Plaintiffs/Third-Party Plaintiffs-
Appellants,

v

ANTHONY MARROCCO and ANTHONY
FANELLI,

Third-Party Defendants-Appellees.

Before: TALBOT, C.J., and METER and TUKEL, JJ.

PER CURIAM.

This is the second time this case has been before this Court. In the first appeal, this Court remanded for further proceedings in *Jode Investments, LLC v Burning Tree Properties, LLC*, unpublished per curiam opinion of the Court of Appeals, issued April 17, 2014 (Docket No. 310957), pp 14-15. On remand, the trial court ordered plaintiffs to pay $588,787.88 to defendants as compensation for plaintiffs' retention of certain personal property. In Docket No. 335299, plaintiffs and third-party defendants filed the instant appeal as of right and defendants filed a cross-appeal. In Docket No. 336726, defendants appeal as of right the trial court's denial of their request for fees and costs. For the reasons provided below, we affirm in part, reverse in part, and remand for further proceedings in Docket No. 335299. But we affirm the denial of costs in Docket No. 336726.

I. BASIC FACTS

As this Court's prior opinion noted, this dispute arises from the failure of Burning Tree Golf and Country Club as an enterprise and "its eventual acquisition by Club Golf Properties, LLC (Club Properties) and Club Golf, Inc. (Club Golf) (collectively the Club entities)." *Id.* at 2. This case involves what the proper disposition should be for property that was once owned by Burning Tree Investors (BTI) and Burning Tree Properties (BTP), once those entities were dissolved. The lengthy and complex factual background leading up to the first appeal can be found in this Court's prior opinion and will not be reproduced here. See *id.* at 2-6.

In the first appeal, this Court determined that

the trial court erred in several respects: it erred when it dismissed the claims by the Burning Tree entities, Mauro, and DiMercurio on the grounds that Fifth Third transferred Burning Tree Investors' personal property and liquor license to Marrocco, Fanelli, or Club Golf; it erred when it determined that Burning Tree Properties' [sic] assigned its right to its property tax refund; it erred when it ordered Burning Tree Investors to transfer its personal property without

-2-

compensation; and it erred when it ordered the dissolution of the Burning Tree entities on the grounds that those entities were no longer capable of conducting business because they did not own any property. [*Id.* at 13-14.]

Although the trial court erred in this manner, this Court declined to grant the requested relief by the Burning Tree entities, Mauro, and DiMercurio that "it reverse the trial court's decisions, restore the entities, and order the return of 'all personal property, including the liquor license' and the 'tax refund.' " *Id.* at 14. Instead, this Court exercised its authority under MCR 7.216(A)(7) ("grant further or different relief as the case may require") and "reverse[d] the trial court's order compelling Burning Tree Investors to transfer its personal property, including its liquor license, to Club Golf, but only to the extent that the court ordered the transfer without compensation." *Jode Investments*, unpub op at 14. The Court further ordered that on remand, the trial court was to conduct an evidentiary hearing to determine the value of those assets and, after determining this value, amend its prior orders "to provide that Club Golf must pay that amount to Burning Tree Investors' members; the order shall provide that each member is entitled to that proportion of the payment that the member would have been entitled to under the membership agreement as of the date of the original order compelling the transfer." *Id.* The Court also reversed the award of the tax refund to Jode Investments, the Club entities, Marrocco, and Fanelli. On remand, the trial court additionally was to

> enter an order compelling Jode Investments, the Club entities, Marrocco, and Fanelli to pay the members of Burning Tree Property for the erroneously disbursed tax refund; the order shall provide that each member is entitled to that proportion of the payment that the member would have been entitled to under the membership agreement as of the date of the original order disbursing the tax refund. [*Id.* at 14-15.]

In a concurring opinion, Judge Kathleen Jansen fully agreed with the majority opinion. However, Judge Jansen further opined that it would be necessary for the trial court on remand to determine whether Mauro and DiMercurio (1) were judicially estopped to receive any compensation and (2) had standing to bring claims on behalf of the Burning Tree entities. *Id.* (JANSEN, J., concurring) at 2.

After the remand, the trial court held the evidentiary hearings on February 12, April 27, and April 30, 2015. On August 14, 2015, plaintiffs moved in the trial court for summary disposition on the ground of judicial estoppel. Plaintiffs argued that the claims Mauro and DiMercurio made in bankruptcy court were in contradiction to what they were claiming in this case. Specifically, plaintiffs asserted that Mauro's and DiMercurio's claim at the bankruptcy court that their membership interests in BTI was worth no more than $3,000, is wholly inconsistent with their claim now, which precludes recovery under the doctrine of judicial estoppel. The trial court held a hearing on this motion and took the matter under advisement.

On September 4, 2015, defendants moved for summary disposition related to the issue of membership interest. Defendants argued that as a result of the second amended operating agreement, the four Class A members of Burning Tree Investors were Mauro, Gesuale, DiMercurio, and Jode Investments, with each having a 25% membership interest. Plaintiffs filed a response and argued that, while Mauro, Gesuale, DiMercurio, and Jode Investments each had

at one point a 25% membership interest, this was not true at the time of the property transfers. Plaintiffs alleged that when the various properties were ordered to be transferred, Mauro and DiMercurio had already filed for bankruptcy, which acted as an involuntary withdrawal from the company under its operating agreement. As a result, plaintiffs argued that Mauro and DiMercurio were entitled to much less than a 25% share. The trial court held a hearing on this motion and took the matter under advisement.

Plaintiffs also filed a "renewed"[1] motion for summary disposition. Plaintiffs argued that because Mauro and DiMercurio had filed for bankruptcy, they had involuntarily withdrawn from the company by the time the property was transferred, which resulted in them being owed nothing for the transfer. Plaintiffs further argued that if any distributions were warranted, they would have to be reduced because of offsets. Specifically, plaintiffs asserted that before any distributions were to be made to defendants, $826,871.93 must be offset from the value of the transferred property.

On July 8, 2016, the trial court entered an opinion and order. In the opinion, the trial court noted that the parties stipulated that the value of the tax refund at issue is $105,780.44. The court noted that the property to be evaluated could be broken down into three sub-areas: (1) the liquor license, (2) the tangible personal property, and (3) the intangible property. The court also used May 4, 2010, as the date of the valuation because that was the effective date of the Assignment of All Assets. Regarding the liquor license, the court found that its value was $30,000, which was within the range provided by the competing experts. The court found that the value of the personal property, after accounting for liabilities, was $517,500.24.[2] The court, however, found that the intangible property had no or a de minimus value.

In its opinion, the trial court also addressed the outstanding motions. The court denied plaintiffs' motion for summary disposition related to judicial estoppel. The court stated that both Mauro and DiMercurio reported that value of their shares in BTI was "unknown," which was accurate at the time they filled out the forms. The court further noted that the bankruptcy court did not adopt the representations because the bankruptcy trustees assigned their own estimated values to the interests. The trial court denied plaintiffs' renewed motion for summary disposition. The court ruled that all the bankruptcy filings occurred after the May 4, 2010 assignment of all assets; thus, any reliance on the bankruptcy filings triggering involuntary withdrawals was misplaced. The court further denied plaintiffs' requests for offsets. And because it rejected plaintiffs' arguments that defendants' membership interests should be lowered, the trial court granted defendants' motion for summary disposition related to

---

[1] It was entitled "renewed" because it re-presented many of the issues plaintiffs raised previously in their motion for summary disposition that was filed on July 25, 2014.

[2] This total is broken down as follows: $407,115.00 for furniture and equipment; $184,765.80 for cash, cash equivalents, accounts receivable, inventories, loan receivables, and other current assets; and $79,380.56 for liabilities. We note that the stated $517,500.24 total encompasses a clerical error—the total should be $512,500.24, which the trial court later corrected in a subsequent order.

membership interests. As a result, Gesuale, Mauro, DiMercurio, and Jode Investment were all considered to have had 25% interests in the Burning Tree entities. Consequently, the trial court ordered that

> the Burning Tree Entities' members are each entitled to 25% of the total value of Burning Tree Investors, LLC's personal property ($547,500.24) and tax refund ($105,780.44), such amount being $163,320.17. In addition, the Burning Tree Entities' members are entitled to statutory interest pursuant to MCL 600.6013(8) on the above-referenced damages as to the [sic] both the tax return and personal property.

On July 29, 2016, plaintiffs' filed a motion for partial clarification and reconsideration of the trial court's July 8, 2016 opinion and order. Plaintiffs argued that the trial court erred when it (1) made a mathematical error when it stated that $517,500.24 was to be paid to defendants instead of $512,500.24; (2) used May 4, 2010, as the relevant date for determining how much should be paid; (3) failed to allow for offsets for a $59,492.80 property tax payment and $28,600 for attorney fee payment; (4) used $407,115 for the value of the personal property without offsetting for the $100,000 already paid; and (5) awarded prejudgment interest under MCL 600.6013(8).

On September 30, 2016, the trial court entered an opinion and order, which noted that the parties had agreed that there was an error related to the value of the personal property: the value should be $542,500.24 instead of $547,500.24. The trial court ruled that the issue of whether Mauro and DiMercurio should receive nothing because they had extinguished their membership interest at the time the transfer was ordered presented the same issue and arguments as before and therefore was not properly presented. The court next decided that plaintiffs' motion for offsets had some merit. The court held that plaintiffs are entitled to an offset of $59,492.80 because it was uncontested that plaintiff Jode Investments paid the taxes in question, which allowed BTP to receive the tax refund. However, the trial court denied plaintiffs' request for an offset for the $28,600 in attorney fees because plaintiffs failed to show what portion of those fees were attributable to BTP's defense in the Fifth Third suit. But the trial court did not allow a $100,000 offset because it found that there was no specific allocation of the total settlement amount to any specific property. Lastly, the trial court found that statutory interest was warranted under MCL 600.6013(8). However, the court clarified that the interest was to be calculated from the date the defendants' counter-complaint was filed, which was July 8, 2016.

Defendants thereafter moved for taxation of costs under MCR 2.625(A)(1) and for attorney fees under MCR 2.625(A)(2) and MCL 600.2591 for plaintiffs' alleged frivolous motions. The trial court denied the request and noted that, while defendants sought $2.5 million in compensation, they ultimately only received approximately $500,000. Because the grant of costs is discretionary, the court thought it would be inappropriate to award costs given that defendants only received a fraction of what they claimed. Regarding the request for attorney fees, the trial court was not persuaded that the motions and arguments plaintiffs raised, although largely unsuccessful, were frivolous.

## II.  DOCKET NO. 335299

## A.  PLAINTIFFS' AND THIRD-PARTY DEFENDANTS' APPEAL

## 1.  STANDING

Plaintiffs and third-party defendants (collectively, "appellants") argue that the trial court erred when it denied their motion for summary disposition on the ground that Mauro and DiMercurio lacked standing.  We disagree.  This Court reviews a trial court's decision on a motion for summary disposition de novo.  *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).  Further, the question of whether a party has standing to sue is a question of law that this Court reviews de novo.  *UAW v Cent Mich Univ Trustees*, 295 Mich App 486, 493; 815 NW2d 132 (2012).

Summary disposition under MCR 2.116(C)(5) is appropriate if "[t]he party asserting the claim lacks the legal capacity to sue."  In reviewing a motion under this subrule, "this Court must consider the pleadings, depositions, admissions, affidavits, and other documentary evidence submitted by the parties."  *Jones v Slick*, 242 Mich App 715, 718; 619 NW2d 733 (2000).  The motion is properly granted if the moving party is entitled to judgment as a matter of law.  *Id.*

"The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to ensure sincere and vigorous advocacy."  *Lansing Schools Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 355; 792 NW2d 686 (2010) (quotation marks and citation omitted).  Importantly, this doctrine is to test whether a party has the ability to *bring* a claim.  See *id.* (stating that the focus is on whether a litigant is the proper party *to request* adjudication of a particular issue).  Thus, the doctrine of standing is not implicated if the party who is alleged to lack standing did not bring the relevant claim that was adjudicated.

Appellants' position is premised on their assertion that defendants Mauro and DiMercurio lacked standing to raise their counter-claims.  However, because the relief that was granted was not based on any of their counter-claims, whether Mauro and DiMercurio had standing to raise these claims is irrelevant.  Indeed, the trial court dismissed all of these counter-claims except for defendants' Count I, which was a request for accounting.  But nothing in the record shows that this Court's order for defendants to be compensated for the improper retention of Burning Tree personal property was based on defendants' claim of accounting.  While this Court noted that the trial court erred when it dismissed defendants' counter-claims based on its determination that Fifth Third transferred BTI's personal property to Marrocco, Fanelli, or Club Golf, this Court importantly, nonetheless, refused to reinstate those claims.  *Jode Investments*, unpub op at 11, 13-14.  Indeed, the Court acknowledged that it was "unclear" whether Mauro or DiMercurio had "the authority to act on the Burning Tree entities' behalf or to cause those entities to continue prosecuting their claims *should we reinstate the entities' claims*."  *Id.* at 14 (emphasis added).  But the Court implicitly found the issue moot because it *did not* reinstate those claims.  Instead, the Court determined that the typical remedy would be to order the return of the property as a remedy, but the Court also found that this remedy was impractical because much of the property "likely suffered from wear and tear and had to be maintained or replaced" due to the amount of time that had lapsed since the property was initially transferred.  *Id.*  As a result, the Court exercised its authority under MCR 7.216(A)(7) to "grant further or different

relief as the case may require" and ordered that, after an evidentiary hearing related to the valuation of the property, defendants were to be compensated for the value of the property as of "the date of the original order compelling the transfer." *Id.*

In our view, it is important to note that this Court's remedy was not dependent on the reinstatement of any of defendants' counter-claims. Consequently, because this Court's order for Club Golf to pay defendants was not related to any of defendants' counter-claims, the issue of standing, as a matter of law, is not implicated, and we affirm the denial of plaintiffs' motion for summary disposition related to standing.

## 2. PROPER CALCULATION DATE AND EFFECT OF BANKRUPTCY

Appellants argue that the trial court used the wrong date for its calculations of the appropriate membership interests for Mauro, DiMercurio, and Gesuale. We review as a question of law whether the trial court properly adhered to this Court's remand order. *Schumacher v Dep't of Nat Resources*, 275 Mich App 121, 127; 737 NW2d 782 (2007). To the extent the trial court made any factual findings, those findings are reviewed for clear error. *Sackett v Atyeo*, 217 Mich App 676, 680; 552 NW2d 536 (1996).

In this Court's prior opinion, it described how the members of the BTI and BTP needed to be compensated for the wrongful retention of (1) BTI's personal property, including its liquor license and (2) BTP's tax refund. Regarding BTI's personal property, the Court stated:

> We reverse the trial court's order compelling Burning Tree Investors to transfer its personal property, including its liquor license, to Club Golf, but only to the extent that the court ordered the transfer without compensation. . . . After determining the value [of the personal property assets, including the liquor license], the trial court shall amend its order to provide that Club Golf must pay that amount to Burning Tree Investors' members; the order shall provide that each member is entitled to that proportion of the payment that the member would have been entitled to under the membership agreement *as of the date of the original order compelling the transfer.* [*Jode Investments*, unpub op at 14 (emphasis added).]

Likewise, regarding the tax refund, the Court stated:

> We also reverse and vacate the trial court's order distributing the Burning Tree Property's tax refund to Jode Investments, the Club entities, Marrocco, and Fanelli. On remand, the trial court shall enter an order compelling Jode Investments, the Club entities, Marrocco, and Fanelli to pay the members of Burning Tree Property for the erroneously disbursed tax refund; the order shall provide that each member is entitled to that proportion of the payment that the member would have been entitled to under the membership agreement *as of the date of the original order disbursing the tax refund.* [*Id.* at 14-15 (emphasis added).]

On remand, the trial court used the date of May 4, 2010, to determine how much each member was entitled to receive as of that date. The court obtained this date from the Assignment of All Assets document, which although having been executed in March 2012, contained an effective date of May 4, 2010.

The document states in its preamble the following:

> This Agreement of All Assets ("Assignment") is effective as of May 4, 2010 (the "Effective Date"), between Burning Tree Investors, LLC, a Michigan limited liability company ("Assignor") and Club Golf, Inc., a Michigan corporation ("Assignee"). (Collectively, the Assignor and Assignee shall be the "Parties.")

The Assignment further provides that "[t]he Assignor hereby assigns, transfers, and conveys to Assignee, the Assignor's entire interest in any and all personal property or other assets of Assignor owned as of January 1, 2010 ("Assets"), subject to the liabilities of the Assignor attached to these Assets as of this date . . . ." The document was signed by Mauro as manager of BTI on March 20, 2012. Notably, because the assignor in this document was BTI, it is clear that it does not and cannot apply to BTP, which possessed the right to the tax refund at issue.

Appellants assert that the trial court's use of the May 4, 2010 date is erroneous because it does not represent the date on which any order compelled any property transfer nor disbursed the tax refund. Instead, appellants claim that the following dates should have been used: (1) January 31, 2012, for the liquor license, (2) March 19, 2012, for the personal property, and (3) March 28, 2012, for the tax refund. Appellants assert that these dates are important because the bankruptcy filings of Gesuale, DiMercurio, and Mauro, which preceded some of these dates,[3] made them ineligible to obtain any disbursements that occurred *after* their filings.

In short, appellants argue that because Gesuale and DiMercurio both filed for bankruptcy before all of the relevant orders, they are entitled to nothing from any of those distributions. Likewise, because Mauro filed for bankruptcy before the orders related to the BTI personal property and the tax refund, appellants aver that Mauro is only entitled to a disbursement related to the liquor license. The trial court found that these arguments were not persuasive because it used May 4, 2010, as the relevant date for all of the transfers, which preceded all of the bankruptcy filings. We need not decide whether the trial court erred when it used the May 4, 2010 date because appellants cannot show how the membership-interests calculations would have been affected by the use of any other date.

Appellants' claim is based on their assertion that the bankruptcy filings of Gesuale, DiMercurio, and Mauro triggered their respective involuntary withdrawals from the Burning Tree entities. Consequently, appellants aver that Gesuale's, DiMercurio's, and Mauro's involuntary withdrawals automatically resulted in their membership interests becoming zero,

---

[3] Appellants allege that Gesuale filed for bankruptcy on June 11, 2010; DiMercurio filed for bankruptcy on September 28, 2011; and Mauro filed for bankruptcy on March 15, 2012.

which would preclude them from receiving any distributions after they withdrew from the companies. Plaintiffs rely on § 6.6 of the BTI operating agreement, which states as follows:

> Except as otherwise specifically provided, in the event of the involuntary withdrawal of a Member, which shall be defined as the occurrence of the death, expulsion, bankruptcy, or dissolution of a Member, then, in addition to any other distribution due the withdrawn Member, pursuant to the [Michigan Limited Liability Company] Act and this Agreement, the Company shall purchase, and the withdrawn Member, or his/her or its successor or estate, as the case may be, shall sell the withdrawn Member's interest in the Company pursuant to the terms and conditions set forth in Paragraph 6.7.

However, while it is undeniable that the occurrence of bankruptcy is one of the conditions precedent for becoming involuntarily withdrawn from the company, it also is undisputed that there is no evidence that the company followed the terms and conditions set forth in § 6.7, which addresses how the company goes about purchasing—i.e., removing—the member's interest. Thus, although Gesuale, DiMercurio, and Mauro filed for bankruptcy, the steps to actually remove their ownership interests, as described in ¶ 6.7 of the operating agreement, were never undertaken. As a result, Gesuale, DiMercurio, and Mauro each held a 25% interest in BTI at all relevant times, irrespective of their status as a purported "withdrawn member." Therefore, the trial court did not err when it awarded Gesuale, DiMercurio, and Mauro their respective 25% shares of the distributions.

## 3. OFFSETS

Appellants next argue that the trial court erred when it failed to allow for certain offsets before it ordered the payment to the members of BTI and BTP. We disagree.

At the outset, we disagree with defendants' argument that allowing for offsets would violate the directive of this Court's remand order. This Court stated that, with respect to BTI's personal property, "the order shall provide that each member is entitled to that proportion of the payment that the member *would have been entitled to under the membership agreement* as of the date of the original order compelling the transfer." *Jode Investments*, unpub op at 14 (emphasis added). Thus, to the extent any offsets are authorized under the membership agreement, they are allowable (and required).

It is undisputed[4] that the four class A members—Jode Investments, Gesuale, DiMercurio, and Mauro—each possessed a 25% share of the Burning Tree entities. Appellants assert that because of capital contributions or payments that plaintiffs, Marrocco, and Fanelli made, there should have been offsets applied before the class A members were paid, which would have greatly reduced the amounts that Gesuale, DiMercurio, and Mauro were entitled to receive. In

---

[4] Except appellants argued that the bankruptcy filings of Gesuale, DiMercurio, and Mauro resulted in their involuntary withdrawals from the companies. This argument was addressed and rejected in Issue III.

support, appellants rely on several provisions of the operating agreement. Most pertinent are the definition of "Capital Account" in Article I and the "Reimbursement" provision contained in § 8.5. Article I provides, in pertinent part, that "[a] Member's Capital Account shall be credited with *the Member's capital contributions*" and "the amount of any Company liabilities assumed *by the Member*." (Emphasis added.) Section 8.5 states, "The Members shall be entitled to reimbursement from the Company for all Company expenses reasonably incurred and *paid for by the Member* on the Company's behalf." (Emphasis added.)

There are three payments that are at issue: a $600,000 payment to Fifth Third Bank, $28,596.13 payment for legal fees, and $138,783 in corporate debt reduction.

It is undisputed that the $2.1 million payment to Fifth Third was $600,000 above the price that was required to redeem the real property of BTP. Appellants claim that $500,000 of this excess was paid to cause dismissal of the Oakland Circuit Court suit against BTI and BTP and to reduce corporate debt. Appellants further allege that the remaining $100,000 of this excess payment was for the release of Fifth Third's security interest in BTI's tangible and intangible assets.[5] However, Marrocco and Fanelli paid this $2.1 million to Fifth Third. It is not clear how any offset in these circumstances would be warranted when neither Marrocco nor Fanelli were a member of BTI or BTP. As neither was a member of BTI or BTP, there are no capital accounts to adjust for any payments Marrocco or Fanelli made, even if the payment benefited one of the companies. Likewise, § 8.5 of the operating agreement only permits *members* to be reimbursed for any expenses they made on behalf of the company. With neither Marrocco nor Fanelli being a member of any Burning Tree entity, any claim for an offset based on a payment made by them is not authorized by any operating agreement. Accordingly, the trial court properly concluded that no offset was appropriate as a result of the $600,000 payment to Fifth Third.

Appellants also argue that they are entitled to offsets as a result of $28,596.13 in legal fees that Marrocco and Fanelli paid to defend the Fifth Third lawsuit. However, as already noted, any payments Marrocco and Fanelli made cannot be a basis for an offset because they were not members of BTI or BTP.

Appellants further claim that the trial court erred when it denied their request for an offset in the amount of $138,783 for the reduction of corporate debt as a result of them reducing Patti's liability. With respect to this issue, the trial court explained:

---

[5] After the evidentiary hearing, the trial court found that there was no allocation of the total settlement amount to any specific property. While defendants submitted the affidavit of Fanelli in support of the $100,000 being used for the release of Fifth Third's security interest in BTI's property, the trial court found the testimony of Fifth Third's representative, Michael Leib, more credible. Although not necessary to the resolution of this issue, we do not believe that the court's finding was clearly erroneous, given the disparate and limited testimony on the topic.

Pursuant to a 2006 settlement agreement, BTI/BTP's members agreed to buy out Mr. Patti's interest in both entities. The settlement agreement included an obligation requiring the remaining members to indemnify Mr. Patti in connection with his guaranty to Fifth Third. While Exhibit 16 establishes that the Burning Tree Entities' members had an obligation to resolve Mr. Patti's obligations under the 2006 settlement agreement, and although Exhibit 15 establishes that the Settlement Agreement resolved Mr. Patti's exposure under his guaranty, *Movants have failed to present any evidence establishing that they paid $138,783.00 for that purpose.* [Emphasis added; citations omitted.]

On appeal, appellants argue that the trial court erred because the court failed to recognize that BTI and BTP were relieved of having to pay this $138,783 debt but for Marrocco and Fanelli's settlement agreement with Fifth Third. But once again, plaintiffs fail to adequately show how any offset is warranted when neither Marrocco nor Fanelli—the ones who paid the money to Fifth Third—was a member of BTI or BTP. Moreover, because Club Golf was ordered to pay the members of BTI and BTP, there is no apparent reason, and plaintiffs fail to identify any, to give Club Golf any offsets when it did not incur this debt on behalf of BTI or BTP.

Consequently, the trial court did not err when it denied plaintiffs' request for offsets for the $600,000 payment to Fifth Third, the $28,596.13 payment for legal fees, and the $138,783 debt resolution.

## 4. JUDICIAL ESTOPPEL

Appellants argue that the trial court erred when it determined that DiMercurio and Mauro were not judicially estopped from recovering anything in connection with their interests in BTI and BTP. We disagree.

"Judicial estoppel is an equitable doctrine, which generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Spohn v Van Dyke Pub Schools*, 296 Mich App 470, 479; 822 NW2d 239 (2012) (quotation marks and citations omitted). Our Supreme Court has adopted the "prior success" model of judicial estoppel, which provides that "a party who has successfully and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding." *Paschke v Retool Indus*, 445 Mich 502, 509; 519 NW2d 441 (1994) (quotation marks, citation, and emphasis omitted). Under this model, "the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted the party's position as true." *Id.* at 510. For judicial estoppel to apply in the context of prior bankruptcy proceedings, a reviewing court must find the following:

(1) [the plaintiff] assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) [the plaintiff's] omission did not result from mistake or inadvertence. In determining whether [the plaintiff's] conduct resulted from mistake or

-11-

inadvertence, [the reviewing] court considers whether: (1) [the plaintiff] lacked knowledge of the factual basis of the undisclosed claims; (2) [the plaintiff] had a motive for concealment; and (3) the evidence indicates an absence of bad faith. [*Spohn*, 296 Mich App at 480-481 (quotation marks and citation omitted).]

At the trial court, appellants argued that DiMercurio was estopped from any recovery because at the bankruptcy court, he filed personal property schedules in September 2011 and January 2012 that listed the value of his 25% interest in BTP as $0.00 and the value of his 25% interest in BTI as "unknown." Assuming that these assertions were contrary to the ones DiMercurio asserts in this case, there is nothing to prove that any omission or contradiction was intentional or done in bad faith. Indeed, when DiMercurio filed these schedules, the assets of BTP, which only consisted of the real property, had already been transferred to Fifth Third via the October 2009 foreclosure sale. And, through a settlement agreement, Club Properties redeemed the real property from Fifth Third in May 2010. Accordingly, there is nothing to suggest that DiMercurio representing the value of his interest in BTP as $0 was done to "play fast and loose with the legal system." *Paschke*, 445 Mich at 509 (quotation marks and citation omitted).

And with respect to DiMercurio's and Mauro's statements that they did not know the value of their respective interests in BTI, there again is no evidence to suggest that these statements were made to hide any information from the bankruptcy court. It is undisputed that when the statements were made to the bankruptcy court, the issues related to the personal property of BTI were the subject of litigation, where the outcome was unknown at the time. Thus, at the time the statements were made to the bankruptcy court, it was entirely unclear what value, if any, holding ownership in BTI had. It also is important to note that DiMercurio and Mauro both specifically noted in their statements to the bankruptcy court that the value of their interests in BTI were "to be determined pending the outcome of litigation." Thus, there is nothing to indicate that DiMercurio's or Mauro's statements to the bankruptcy court were inconsistent with their positions in this litigation, which precludes application of the doctrine of judicial estoppel.

Furthermore, appellants' reliance on the bankruptcy trustees' statements that the value of DiMercurio's and Mauro's membership interests in BTI was $3,000 for DiMercurio and $2,500 for Mauro is misplaced. These statements clearly are the estimated values that were determined *by their respective trustees*—not by DiMercurio or Mauro. Appellants have offered no authority to attribute these particular statements and estimates to DiMercurio or Mauro, and we decline to do so.

Finally, appellants argue that DiMercurio and Mauro both lack standing because their respective bankruptcy trustees did not abandon or authorize an action for compensation. See 11 USC 541; *Miller v Chapman Contracting*, 477 Mich 102, 106; 730 NW2d 462 (2007). But as described in Part II-A-1 of this opinion, whether DiMercurio or Mauro have standing is irrelevant because any award of compensation is not tied to any of their counter-claims.

5. STATUTORY INTEREST UNDER MCL 600.6013

Appellants argue that the trial court erred when it awarded statutory interest pursuant to MCL 600.6013. We agree. We review the trial court's award of statutory interest de novo. *Farmers Ins Exch v Titan Ins Co*, 251 Mich App 454, 460; 651 NW2d 428 (2002). Likewise, we review issues of statutory interpretation de novo. *City of Riverview v Sibley Limestone*, 270 Mich App 627, 630; 716 NW2d 615 (2006).

MCL 600.6013(1) states, in pertinent part, that "[i]nterest is allowed on a money judgment recovered in a civil action, as provided in this section." "The purpose of this statute is to compensate the prevailing party for loss of use of the funds awarded as a money judgment and to offset the costs of litigation." *Farmers Ins Exch*, 251 Mich App at 460. Notably, "an award of interest is mandatory in all cases to which the statute applies." *Everett v Nickola*, 234 Mich App 632, 638; 599 NW2d 732 (1999).

This issue comes down to whether the judgment at issue is indeed a "money judgment" as contemplated in the statute. The statute does not provide a definition for "money judgment," but this Court has stated, "A money judgment in a civil action is a judgment 'that orders the payment of a sum of money, as distinguished from an order directing an act to be done or property to be restored or transferred.' " *Lech v Huntmore Estates Condo Ass'n*, 315 Mich App 288, 291; 890 NW2d 378 (2016), quoting *In re Forfeiture of $176,598*, 465 Mich 382, 386; 633 NW2d 367 (2001); see also *Black's Law Dictionary* (10th ed) (defining "money judgment" as "[a] judgment for damages subject to immediate execution, as distinguished from equitable or injunctive relief"). However, merely because a judgment awards money, it does not necessarily follow that the judgement is a "money judgment." For example, "money awards in drug forfeitures, divorce judgments, awards of back pay for wrongful discharge, and awards reflecting payment of a forced share in an estate" are not money judgments under the statute. *Lech*, 315 Mich App at 291. Additionally, and analogous to our situation, a judgment in a shareholder-oppression case ordering the purchase of company stock is not a money judgment. *Moore v Carney*, 84 Mich App 399, 406; 269 NW2d 614 (1978). In *Moore*, the plaintiff filed a shareholder oppression suit. The trial court found that specific acts of mismanagement occurred and that the defendants were oppressive and unjust toward the plaintiff minority shareholder. *Id.* at 401-402. As a remedy, the court ordered the defendants to purchase the plaintiff's stock in the company for $55,000. *Id.* at 402. This Court held that statutory interest was not available under MCL 600.6013 because, while the judgment involved money, it was "part of an equitable remedy." *Id.* at 405. The Court explained that

> [t]he judgment ordered [the] defendants to restore [the plaintiff] to her position prior to the oppressive acts which began in 1969. It required [the] defendants to purchase the stock from [the plaintiff] at the value of the stock in 1969. It is not a mere money judgment as that term is defined in Black's Law Dictionary . . . . [*Id.*]

Although not the same factual scenario as described in *Moore*, we find *Moore* persuasive. Here, this Court ordered that the owners of BTI be compensated for the (wrongful) transfer of BTI's property to Club Golf, which would restore defendants' position to where it had been before the transfers took place. *Jode Investments*, unpub op at 14-15. As a result, the order to

-13-

compensate defendants here is analogous to the order in *Moore* because both orders compelled that money be paid to restore the respective parties. The fact that *Moore* involved an order to purchase company stock, while the present case involves an order to purchase company property is not significant. Furthermore, when this Court granted relief to defendants, here, it did so under its authority under MCR 7.216(A)(7), which allows this Court to "enter any judgment or order or grant further or different relief as the case may require[.]" Thus, it is clear that the relief granted was equitable in nature.

And more problematic for defendants is that the relief they received was not due to any particular claim they made. As noted previously, their relevant counter-claims were dismissed prior to the original appeal,[6] and this Court declined to reinstate them. *Jode Investments*, unpub op at 14-15. Therefore, unlike in a typical situation where a judgment winner can point to his complaint as the basis for the relief he received, that cannot be accomplished here. The lack of a nexus between defendants' counter-complaint and their judgment award is fatal when seeking interest under MCL 600.6013. As this Court has explained, "A party, despite prevailing in the underlying action, has not obtained a money judgment recovered in a civil action if that party has not filed a complaint in the proceeding." *Olson v Olson*, 273 Mich App 347, 353; 729 NW2d 908 (2006). While defendants did file a counter-complaint they cannot rely on it for interest under MCL 600.6013 because their salient claims were dismissed.

## B. DEFENDANTS' CROSS-APPEAL

### 1. PROPERTY TAX REFUND OFFSET

In their cross-appeal, defendants argue that the trial court erred when it found that Jode Investments paid the 2010 summer property taxes on behalf of BTP in the amount of $59,492.80 and that Jode Investments was entitled to receive credit in the form of an offset for that payment. We disagree. The issue of whether plaintiffs were entitled to an offset for the payment of property taxes in 2010 was raised in plaintiffs' renewed motion for summary disposition, which the trial court eventually granted on this issue. Therefore, as an issue pertaining to summary disposition, this Court's review is de novo. *Maiden*, 461 Mich at 118.

One of the tasks which this Court, in its prior opinion, ordered the trial court to perform was to award BTP's property tax refund to its members. In their renewed motion for summary disposition, plaintiffs argued that Jode Investments was entitled to an offset for the $59,492.80 it paid for property taxes. The trial court initially denied plaintiffs' request for an offset for this tax payment because it determined that plaintiffs had failed to show that Jode Investments had made the property tax payment at issue. In plaintiffs' motion, they relied on a single document that noted that Jode Investments had contributed $59,492.80 for summer 2010 property taxes.[7]

---

[6] Only defendants' claim for accounting survived.

[7] Interestingly, the document was for tracking BTI's members' contributions, not BTP's. Thus, this document, on its face, shows that Jode Investments contributed $59,492.80 to BTI for the purposes of summer 2010 property taxes.

In their motion for reconsideration, plaintiffs argued that in addition to the BTI document attached to their renewed motion for summary disposition, they had attached to their reply brief in support of the motion an affidavit from Fanelli, where Fanelli stated, "Jode [Investments], Marrocco and myself also paid the following corporate expenses which have not been reimbursed to us by BTP or BTI to date: . . . **$59,492.80** for Summer 2010 property taxes[.]"

The trial court granted this portion of plaintiffs' motion for reconsideration. The court stated:

> As a preliminary matter, it is undisputed that the tax [refund] was the property of BTP. Pursuant to the plain and unambiguous terms of the Court of Appeals decision, the members of BTP are entitled to the portion of the tax [refund] they would have been entitled to under BTP's membership agreement. Movants have provided uncontested evidence that Plaintiff Jode paid the taxes in question, and that BTP would not have received the tax refund in question but for Plaintiff's Jode's payment. As a result, the Court is convinced that Movants are entitled to a setoff in the amount of $59,492.80 against the value of the tax [refund] for the property taxes paid by Plaintiff Jode.

The trial court did not err. The submitted evidence leaves no question of fact on this issue and shows that Jode Investments contributed $59,492.80 that ultimately went to pay property taxes for BTP. While the payment did not go directly to the taxing authority, there was evidence to show that the payment ultimately was used for that purpose. Defendants' reliance on the fact that the evidence shows that BTI provided the $59,492.80 to BTP is misplaced. Indeed, the fact that BTI loaned the funds to BTP actually supports plaintiffs' view because the contribution sheet they initially submitted and relied on shows that Jode Investments made the contribution to BTI. Thus, the evidence shows that Jode Investments supplied the $59,492.80 to BTI, which in turn loaned those proceeds to BTP.

As a result, the trial court did not err when it found no question of fact on this issue and granted summary disposition in favor of plaintiffs related to this offset.

## 2. VALUE OF INTANGIBLE PROPERTY

Defendants next argue that the trial court erred when it found that BTI's intangible assets had no value. We disagree. This Court reviews the trial court's factual findings for clear error. *Sackett*, 217 Mich App at 680. A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake was made. *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007).

On remand, the trial court was to determine the value of BTI's personal property, which necessarily included any intangible assets. At the evidentiary hearing, defendants offered the testimony of an expert witness, Jesse Ultz, who calculated the "damages arising from Club Golf's taking and use of the non-real estate assets" of BTI. Ultz utilized three approaches: market transaction approach, cash-flow approach, and asset-based approach. But only in the asset-based approach did Ultz provide a specific value for the intangible assets. He claimed that $1.33 million of the total $2.0 million in assets were from the intangible assets. Ultz arrived at

the $1.33 million amount for the intangible assets as the cost to re-create the member list, which he described as the "primary" intangible asset.

In rebuttal, plaintiffs offered the testimony of an expert witness, Philip Gaglio, who opined that the intangible assets had no value. Gaglio explained that he had severe reservations with how Ultz did his calculations and found his valuation of the intangible assets as having a value in excess of $1 million as inherently unreasonable. In particular, Gaglio maintained that without a positive cash flow, which BTI lacked from 2008 through 2010, intangible assets would have no real value. Moreover, Gaglio noted that the primary intangible asset, the membership list, was not proprietary. All members of Burning Tree received a copy of the member list, so anyone could have obtained the list by simply becoming a member for a month, which could cost as little as $300, as compared to the $1.33 million and three-year period Ultz assessed as the "cost to re-create member list."

The trial court agreed with Gaglio's view and found that the intangible assets "had a de minimus value, if any." This finding is not clearly erroneous. Ultz's valuation of the intangible assets as being $1.33 million was predicated on his estimate of the "cost to re-create" the member list.[8] The evidence showed that the true cost to obtain that list would have been minimal because, as the trial court noted, the list itself was distributed to all of the golf course members and was not maintained in a confidential manner. Thus, it would not have cost anywhere near $1.33 million to "re-create" the list, and it would not have taken three years to do so. Furthermore, Gaglio showed that these assets were not contributing to a positive cash flow, which made their "value" dubious. Accordingly, we are not left with a definite and firm conviction that the trial court made a mistake with its valuation of the intangible assets.

### 3. LOAN RECEIVABLE

Defendants argue that the trial court erred when it failed to include $396,176 as a loan receivable in BTI's personal property. We agree.

The trial court primarily adopted Ultz's numbers for valuing the tangible assets of BTI and referenced the same five categories Ultz used for BTI's current assets: (1) cash and cash equivalents, (2) accounts receivable, (3) inventory, (4) loan receivable, and (5) other current assets. With respect to the loan receivable, Ultz listed a value of $396,176, which he said he obtained "from the 2010 partial-year tax returns of [BTI] and [BTP]." On this topic, the trial court stated:

> Mr. Ultz's report also listed a "loan receivable of $396,176.00 as one of BTI's assets as of April 30, 2010. Mr. Ultz's report also provided that he utilized BTI's and BTP's balance sheets to compile the list of assets and liabilities. However, *it is unclear whether the loan receivable was BTI's or BTP's asset.*

---

[8] Ultz later attempted to somewhat take back his previous testimony that the intangible assets only consisted of the membership list. But his report clearly shows that he only considered the membership list when calculating the $1.33 million amount.

*Moreover, the Court has not noted an entry for this asset on any of BTI's tax documents.* Consequently, the Court is convinced that Defendants have failed to establish that this was BTI's asset or that it had a value of $396,176.00. [Emphasis added.]

While the trial court commented that defendants failed to prove that this loan receivable was indeed an asset of BTI *or that this asset had a value of $396,176*, it is clear that, contrary to plaintiffs' argument on appeal, the court did not require additional testimony or evidence to prove this value. Instead, the trial court merely was recognizing that, from its perspective, *without an entry in the tax returns*, there was no evidence to substantiate the purported $396,176 value. However, BTI's 2010 tax return does show this as an asset on three different pages. On page 14 of the tax return, it states that as of April 30, 2010, under account 1113, "L/R – BURNING TREE PROPERTIES" had an unadjusted value of $396,176.04. On page 25, under "Other current assets," it lists account 1113 and "L/R – BURNING TREE PROPERTIES" with an unadjusted value of $396,176.04. And finally, on page 58 of the tax return, it states that account 1113 "L/R BURNING TREE PROPERTIES" has a closing balance of $396,176.04. Therefore, with these specific references in BTI's 2010 tax return, the trial court clearly erred when it found that BTI's tax return contained no reference to this loan receivable. And because the trial court denied defendants' request to be reimbursed for this asset based on the fact that there was no evidence of this asset in BTI's tax return, the trial court on remand is to include this loan receivable as part of BTI's assets and distribute it to Jode Investments, DiMercurio, Mauro, and Gesuale.

We reject plaintiffs' argument that a court cannot rely on numbers and values listed in a tax return and instead require that there must be additional "evidence or testimony to support the amount" listed in the tax return. Plaintiffs cite to no authority for this proposition, and if they wanted to call the numbers contained in the tax return into question, it was incumbent on them to introduce such contradictory evidence.

### 4. COURT'S AUTHORITY TO MANAGE EXPERT WITNESSES

Defendants argue that the trial court erred when it allowed Gaglio to testify as a rebuttal witness and compounded the error when it failed to permit defendants to present Ultz to respond to the matters Gaglio raised in his testimony. We disagree. We review the trial court's decisions on these rebuttal matters for an abuse of discretion. *Pastrick v Gen Tel Co of Mich*, 162 Mich App 243, 245; 412 NW2d 279 (1987); see also *Taylor v Blue Cross/Blue Shield of Mich*, 205 Mich App 644, 655; 517 NW2d 864 (1994) (discussing abuse of discretion standard with respect to rebuttal evidence). A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Rental Properties Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 531; 866 NW2d 817 (2014).

There are no hard or discrete requirements that must be met before a court can allow an undisclosed witness to testify on rebuttal. *Pastrick*, 162 Mich App at 245. Indeed, "[t]rial courts should not be reluctant to allow unlisted witnesses to testify where justice so requires, particularly with regard to rebuttal witnesses." *Id.* As the *Pastrick* Court explained:

Justice is not served by merely restricting a trial judge's decision in such a case to permitting or not permitting an undisclosed witness to testify. Rather, we believe justice is best served where an unlisted witness can be permitted to testify while the interests of the opposing party are adequately protected. If reasonable conditions can allow the testimony of the undisclosed witness to be admitted without prejudice to the opposing parties, then [there is] nothing wrong with permitting the witness to testify subject to those conditions. [*Id.* at 246.]

Simply put, "a trial court may, within its discretion, permit an undisclosed witness to testify on rebuttal subject to reasonable conditions." *Id.*

Here, plaintiffs on April 27, 2015, asked the trial court to allow Gaglio to testify as a rebuttal witness to Ultz's testimony. The trial court stated that it would allow Gaglio to do so three days later on April 30, which would afford defendants two full days to review Gaglio's report and prepare for cross-examination. There is nothing in the record to indicate that defense counsel had insufficient time to review Gaglio's report. In fact, the record shows that defense counsel subjected Gaglio to a vigorous cross-examination. Accordingly, with these facts, we cannot conclude that the trial court selected an unreasonable or unprincipled outcome.

The trial court also did not abuse its discretion when it did not allow defendants to recall Ultz for purposes of challenging Gaglio's testimony. Gaglio was called as a rebuttal witness, whose purpose was to "undercut" the opponent's case. See *Sullivan Indus, Inc v Double Seal Glass Co*, 192 Mich App 333, 348; 480 NW2d 623 (1991). Here, because Ultz previously testified regarding his methodology for calculating the value of BTI's intangible assets, the trial court did not think that allowing him to testify again, in rebuttal to Gaglio, would be necessary because it was already "well-informed" on the views of the two experts. Importantly, because defendants did not provide an offer of proof on Ultz's proposed testimony, see MRE 103(a)(2), it is not clear what else Ultz would have added that he had not already described in his prior testimony. As a result, the trial court did not abuse its discretion when it declined to allow Ultz to testify again.

## III. DOCKET NO. 336726

In Docket No. 336726, defendants argue that the trial court erred when it denied their motion for costs and attorney's fees. Defendants' request had two components: costs as a prevailing party under MCR 2.625(A)(1) and attorney's fees for defending against frivolous motions under MCR 2.625(A)(2) and MCL 600.2591.

This Court reviews a trial court's ruling on a motion for costs under MCR 2.625(A)(1) for an abuse of discretion. *Gentris v State Farm Mut Auto Ins Co*, 297 Mich App 354, 365; 824 NW2d 609 (2012). "However, issues concerning the interpretation and application of MCR 2.625 are reviewed de novo." *Id.* Because the determination of whether sanctions are permitted under MCR 2.625(A)(2) and MCL 600.2591 is predicated on a factual finding that a claim or defense was frivolous, this Court's review is for clear error. *Ladd v Motor City Plastics Co*, 303 Mich App 83, 103; 842 NW2d 388 (2013); *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 533; 773 NW2d 57 (2009).

MCR 2.625(A)(1) provides, "Costs will be allowed to the prevailing party in an action, unless prohibited by statute or by these rules or unless the court directs otherwise, for reasons stated in writing and filed in the action." Contrary to defendants' argument on appeal, the award of costs under this court rule is discretionary. *Allard v State Farm Ins Co*, 271 Mich App 394, 403; 722 NW2d 268 (2006); *Blue Cross & Blue Shield of Mich v Eaton Rapids Community Hosp*, 221 Mich App 301, 308; 561 NW2d 488 (1997). While a court is not required to justify awarding costs to a prevailing party, it must justify the failure to award costs. *Id.* "When costs are denied to the prevailing party for reasons written and filed by the court, the court's determinations should not be reversed on appeal unless its written reasons are totally unsupported by the facts involved in the case." *Gentris*, 297 Mich App at 365 (quotation marks, citation, and brackets omitted).

The trial court noted that it was going to consider defendants as the prevailing party because they did improve their position as a result of the proceedings after remand on account of their having been awarded over $500,000 when before they were receiving nothing. However, because defendants argued that they should have received $2.5 million, the court declined to award costs based on their having received "only . . . a fraction of that [requested] amount." The trial court's reasoning does not fall outside the range of reasonable and principled outcomes. Accordingly, the trial court did not abuse its discretion when it declined to award costs under MCR 2.625(A)(1) based on the fact that defendants received only 20% of what they sought. Further, defendants' argument that there is no statute or court rule that provides for the disallowance of costs under these circumstances is misplaced. MCR 2.625(A)(1) provides that costs will be allowed to the prevailing party except under three circumstances: (1) "unless prohibited by statute," (2) unless prohibited by the court rules, or (3) "*unless the court directs otherwise.*" (Emphasis added.) Therefore, the fact that a statute or court rule does not disallow costs when a prevailing party receives just a fraction of what it sought is not controlling because the third exception allows a court to exercise its discretion to disallow the award of costs for *any* principled reason.

In support of their request for attorney fees, defendants relied on MCR 2.625(A)(2), which provides as follows:

> In an action filed on or after October 1, 1986, if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591.

MCL 600.2591, in turn, states:

> (1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

> (2) The amount of costs and fees awarded under this section shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees.

(3) As used in this section:

(a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.

(b) "Prevailing party" means a party who wins on the entire record.

In their motion for attorney fees, defendants asserted that the many motions that plaintiffs filed after this Court's remand "were devoid of arguable legal merit," thereby falling under MCL 600.2591(3)(a)(*iii*)'s definition of "frivolous." Defendants argued that these motions sought rulings that Club Golf did not have to pay anything to defendants Mauro, DiMercurio, and Gesuale, which was contrary to this Court's directions on remand. The trial court disagreed and found that plaintiffs' motions were not frivolous.

The first issue addressed by plaintiffs' motions is that Mauro and DiMercurio lacked standing to prosecute the Burning Tree entities' claims. The trial court found that this issue was not frivolous because the argument was "brought to light" in this Court's prior opinion, where it stated that it was not clear whether Mauro and DiMercurio had standing. This finding is not clearly erroneous. While the issue of standing ultimately was not pertinent because any relief was not granted based on any of defendants' counter-claims, it is hard to suggest that the issue was "devoid of legal merit" when all three members of this Court's prior panel did make a point to question whether defendants did have standing. *Jode Investments*, unpub op at 14; *Jode Investments* (JANSEN, J., concurring), unpub op at 2 n 1. Moreover, merely because a motion was unsuccessful does not mean that it was necessarily frivolous. See *Jerico Constr, Inc v Quadrants, Inc*, 257 Mich App 22, 36; 666 NW2d 310 (2003). As a result, the trial court did not clearly err when it found that costs were not warranted in connection with plaintiffs' motion related to standing.

Another issue addressed by plaintiffs in their motions before the trial court was that Mauro and DiMercurio were judicially estopped from claiming that the value of their interests in BTI exceeded $2,500 or $3,000, respectively. Although this is a closer question, we find that the trial court did not clearly err when it found that the motion on this topic was not devoid of legal merit. One of this Court's remand instructions was for the trial court to determine the value of the BTI personal property and to have Club Golf pay that value to BTI's members in accordance with BTI's operating agreement. The concurring opinion additionally added, "[I]t is unclear whether and to what extent Mauro and DiMercurio should be judicially estopped from proceeding in this matter given their previous bankruptcy filings." *Jode Investments* (JANSEN, J.,

concurring), unpub op at 1.[9] On the one hand, this Court's instructions appear to leave no room for alternate avenues, such as the application of the doctrine of judicial estoppel, for Club Golf to avoid paying the BTI members. On the other hand, this Court's opinion does not *expressly* preclude the application of the doctrine and, in fact, the concurring opinion would make the analysis mandatory. *Id.* at 2. Because of the lack of clarity in this Court's prior opinion on this point, we hold that plaintiffs' attempt to seek a ruling on the doctrine of judicial estoppel was not "devoid of legal merit." Accordingly, we affirm the denial of defendants' request for attorney fees related to this issue.

## IV. CONCLUSION

In Docket No. 335299, we affirm in part, reverse in part, and remand for further proceedings. On remand, the trial court is to consider the $396,176 loan receivable as an asset of BTI and order that this amount be paid to the members of BTI consistent with this Court's prior instructions. Further, the trial court is to rescind any award of statutory interest under MCL 600.6013. We do not retain jurisdiction. No taxable costs, as no party prevailed in full. MCR 7.219.

In Docket No. 336726, we affirm. Plaintiffs and third-party defendants, as the prevailing parties, may tax costs pursuant to MCR 7.219.

/s/ Michael J. Talbot
/s/ Patrick M. Meter
/s/ Jonathan Tukel

---

[9] Of course, concurring opinions are not binding. *Dean v Chrysler Corp*, 434 Mich 655, 661 n 7; 544 NW2d 699 (1990).